IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BARRY J. STEINFELDER, *

  Plaintiff *

    v. * CIVIL No. 12-cv-2970-JKB

CATLIN SPECIALTY INSURANCE *
COMPANY, *et al.*,
 *
  Defendants
 *

\* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

Barry J. Steinfelder ("Plaintiff") brought this suit against Catlin Specialty Insurance Company ("Catlin") and Ogilvie Security Advisors, Corp. ("Ogilvie" and, collectively with Catlin, "Defendants"), alleging breach of contract, fraud, civil conspiracy to commit fraud, violation of N.Y. INS. LAW § 2316, tortious interference with contractual relations, and seeking to recover attorneys' fees. Now pending before the Court are Catlin's motion to dismiss (ECF No. 27), Ogilvie's motion to dismiss (ECF No. 28), and Plaintiff's motion to amend the complaint (ECF No. 37). The issues have been briefed and no hearing is required. Local Rule 105.6. For the reasons set forth below, Catlin's motion to dismiss will be GRANTED IN PART and DENIED IN PART, Ogilvie's motion to dismiss will be GRANTED IN PART and DENIED IN PART, and Plaintiff's motion to amend the complaint will be GRANTED.

    I.    **BACKGROUND**

From 1999 through October 2010, Plaintiff was an independent contractor for Ogilvie, a Maryland corporation and broker-dealer that did business through licensed representatives. (Am.

Compl. ¶ 3, 7; ECF No. 37-1.)[1] During this period, Plaintiff was registered with Financial Industry Regulatory Authority ("FINRA")—a self-regulatory organization for securities firms doing business in the United States—as a registered representative for Ogilvie. (*Id.* ¶ 7.) Ogilvie offered "products, services, support staff, technology and competitive payouts" to the licensed registered representatives, who in turn offered various investment products to their clients. (*Id.* ¶ 3.) Ogilvie required all of its registered representatives, including Plaintiff, "to enroll and obtain Ogilvie's Errors and Omissions Insurance ("E&O") policy." (*Id.* ¶ 7.) During his tenure with Ogilvie, Plaintiff purchased this required insurance through various insurance companies, and at all times he paid his premiums for the E&O insurance "directly to Ogilvie." (*Id.* ¶ 8.)

In May 2007, Ogilvie notified Plaintiff "by e-mail that effective June 1, 2007, Catlin would be providing Ogilvie's E&O insurance coverage." (*Id.* ¶ 9.) Plaintiff continued paying his insurance premiums to Ogilvie, and "Catlin never demanded or required [Plaintiff] to pay the insurance premium payments directly to Catlin. Ogilvie and Catlin never forwarded copies of the applicable policy then in effect to [Plaintiff], despite his requests." (*Id.*) "Ogilvie annually renewed its E&O insurance coverage policy with Catlin and Catlin provided continued, uninterrupted E&O coverage to [Plaintiff] from June 2007 through 2010." (*Id.* ¶ 10.) The events relevant to the amended complaint occurred during the terms of policies that were effective from June 1, 2009 through June 1, 2010 (the "2009/10 Policy"), and June 1, 2010 through June 1, 2011 (the "2010/11 Policy"), respectively. (*Id.* ¶ 11.)

On April 16, 2010, FINRA served Plaintiff with a copy of an arbitration claim made by Mr. and Mrs. Warren Klawans and their related trusts against Plaintiff and Ogilvie. (Am. Compl. ¶ 18.) Ogilvie received a copy of the arbitration claim on the same day. (*Id.*) This

---

[1] The facts are recited here as alleged by the Plaintiff, this being a motion to dismiss. *See Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).

2

arbitration, known as FINRA Arbitration No. 10-01314, related to "the possible purchase of variable life insurance policies [by the Klawans] in January 2007." (*Id.*) After being served with the claim, Plaintiff "began communicating with Ogilvie almost immediately." (*Id.* ¶ 19.) On May 6, 2010, Plaintiff shared "a copy of his draft response to the FINRA inquiry [with] Ogilvie's counsel." (*Id.* ¶ 20.) Plaintiff alleges that he "was led to believe that Ogilvie's mandatory E&O policy would be providing coverage," and that he therefore "reasonably concluded that his communications with [Ogilvie and its representative] about the claim thereby provided notice to Catlin." (*Id.*)

On May 27, 2010, Ogilvie informed Plaintiff that the Policies did not cover the Klawans' arbitration claim. (*Id.* ¶ 21.) On June 2, 2010, Plaintiff retained counsel. (*Id.* ¶ 22.) On August 25, 2010, a representative of the producer of the Policies "confirmed that Catlin had been provided notice of the matter." (*Id.* ¶ 23.) From at least May 2010 through October 2010, Plaintiff repeatedly requested that Ogilvie or Catlin provide Plaintiff with a copy of the Policies. (*See id.* ¶¶ 21, 24.) On October 15, 2010, Catlin provided Plaintiff with a copy of the 2010/11 Policy. (*Id.* ¶ 24.) On October 26, 2010, Catlin declined coverage. (*Id.* ¶ 26.)

On August 27, 2012, Plaintiff filed his complaint in the Circuit Court of Maryland for Baltimore County. On October 5, 2010, Defendants removed the case to this Court. On November 12, 2012, Defendants filed separate motions to dismiss (ECF Nos. 27, 28). On December 18, 2012, Plaintiff filed a motion for leave to amend the complaint (ECF No. 37). On March 29, 2013, Ogilvie filed a notice that it no longer intends to provide a defense in this litigation (ECF No. 47).

## II. LEGAL STANDARD

A motion to dismiss under FED. R. CIV. P. 12(b)(6) is a test of the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). To pass this test, a complaint need only present enough factual content to render its claims "plausible on [their] face" and enable the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiff may not, however, rely on naked assertions, speculation, or legal conclusions. *Bell Atl. v. Twombly*, 550 U.S. 544, 556-57 (2007). In assessing the merits of a motion to dismiss, the court must take all well-pled factual allegations in the complaint as true and construe them in the light most favorable to the Plaintiff. *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). If after viewing the complaint in this light the court cannot infer more than "the mere possibility of misconduct," then the motion should be granted and the complaint dismissed. *Iqbal*, 556 U.S. at 679.

Leave to file an amended or supplemental pleading should be "freely give[n] where justice so requires." FED. R. CIV. P. 15(a)(2). A district court may deny leave, however, if: (1) the new pleading would prejudice the opposing party; (2) the moving party has acted in bad faith; or, (3) the new pleading would be futile (*i.e.*, if it could not withstand a motion to dismiss). *Laber v. Harvey,* 438 F.3d 404, 426 (4th Cir. 2006); *Perkins v. U.S.*, 55 F.3d 910, 917 (4th Cir. 1995). If a district court chooses to deny leave, it must give justifying reasons. *See id.* (citing *Foman v. Davis,* 371 U.S. 178, 182 (1962)).

## III. ANALYSIS

Plaintiff moved to amend the complaint while Defendants' motions to dismiss the original complaint were pending. The amended complaint will not prejudice the Defendants, and

there is no evidence that it was offered in bad faith.  Therefore, the Court will grant Plaintiff's motion to amend unless that amendment would be futile.  The proposed amendment is not futile because, as explained more fully below, some of the proposed amendments can withstand a motion to dismiss.  *Compare Perkins*, 55 F.3d at 917.

It is well-established law that federal district courts sitting in diversity apply the choice of law rules of the forum state.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  The Court will therefore apply Maryland choice of law rules.  In contract actions, Maryland courts generally apply the law of the jurisdiction where the contract was made.  However, the Policies contain a choice of law provision, which provides that "the laws of the State of New York shall govern all Issues pertaining to the meaning, interpretation and effect of this Policy and its terms and provisions, as well as the parties' rights and obligations under this Policy, the Insurer's handling of Claims and all other related matters."  Pursuant to this provision, the breach of contract claims are governed by New York law.  *See Jackson v. Pasadena Receivables, Inc.*, 921 A.2d 799, 803 (Md. 2007) ("With limited exceptions, this Court has long recognized the ability of contracting parties to specify in their contract that the laws of a particular State will apply in any dispute over the validity, construction, or enforceability of the contract, and thereby trump the conflict of law rules that otherwise would be applied by the court.").

For tort claims, Maryland courts generally adhere to the doctrine *lex loci delicti* and apply the substantive law of the place where the injury occurred.  *See Lewis v. Waletzky*, 31 A.3d 123, 129 (Md. 2011).  The parties agree that Maryland choice of law rules allow parties to extend their contractual choice of law provisions to encompass contract-related tort claims if the language is sufficiently broad.  The parties also seem to agree that the provision, which applies to contractual interpretation and "all other related matters," is sufficiently broad to encompass the

5

tort claims in the amended complaint.² Therefore, the Court will "honor[] the intent of the parties to choose the applicable law," and apply New York law to the contract-related tort claims.

### A. Count I – Breach of Contract – 2009/10 Policy

The amended complaint adequately states a claim for breach of the 2009/10 Policy against Catlin, but not against Ogilvie. In order to state a claim for breach of contract under New York law, Plaintiff must plead facts adequate to support the following elements: (1) existence of a contract; (2) performance of the contract by Plaintiff; (3) breach by Defendants; and (4) damages. *First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998).

#### 1. Catlin

The 2009/10 Policy is a claims-made-and-reported policy, which means that it "only affords coverage for claims first made against [Plaintiff] and reported to [Catlin] in writing during the policy period or discover period, if applicable." (Am. Compl. Ex. A, ECF No. 2-1.) It further provides that, as "a condition precedent to" Catlin's obligations, Plaintiff "shall give [Catlin] written notice of Claims made against [Plaintiff] as soon as practicable, but in no event later than . . . the end of the Policy Period."³ (*Id.* p. 13.)

Catlin argues that this claim should be dismissed because Plaintiff did not report the Klawans' arbitration claim to Catlin in writing during the policy period—which ran from June 1, 2009 through June 1, 2010. The parties agree that Plaintiff received the Klawans' claim on April

---

² In *Hitachi Credit America Corp. v. Signet Bank*, 166 F.3d 614 (4th Cir. 1999), the Fourth Circuit applied a choice of law provision to contract-related tort claims. Although the Fourth Circuit was applying the Virginia choice of law rules in *Hitachi*, both Maryland and Virginia follow *lex loci delicti*. Furthermore, in analyzing the issue, the Fourth Circuit looked to precedent from the Third and Sixth Circuits, which suggests that such comparisons are appropriate in the absence of precedent from the forum state. Given the lack of definitive Maryland precedent on this issue, the Court will follow the Fourth Circuit's approach.

³ The Policy also provides that Plaintiff could report claims that were first made during the final 30 days of the policy period up to 30 days after the end of the policy period. That provision is not relevant to this case, because Plaintiff received the Klawans' claim in April 2010.

16, 2010.  Plaintiff alleges that he gave informal notice of the claim to Ogilvie shortly after receiving it, and that he gave Ogilvie written notice of the claim—in the form of his draft response—no later than May 6, 2010.  (*Id.* ¶¶ 19, 20.)  According to Plaintiff, Ogilvie had copies of the FINRA inquiry, Plaintiff's response, and the Klawans' arbitration complaint no later than May 12, 2010.  (*Id.* ¶ 20.)  On May 27, 2010, Ogilvie informed Plaintiff "that the [2009/10] Policy would not cover the claim filed in the Arbitration matter."  (Am. Compl. ¶ 32.)  Ogilvie had no obligation to provide Plaintiff with a defense to these claims, and had no authority to determine whether Catlin would provide coverage under the 2009/10 Policy.  It is reasonable to infer that Ogilvie provided Catlin with written notice of the claims and then communicated Catlin's denial of coverage to Plaintiff; the cumulative effect of these allegations is an allegation that Catlin had actual notice of the claim during the policy period.  Notably, Catlin does not appear to dispute that actual notice would satisfy the requirements of the 2009/10 Policy.  For that reason, Plaintiff has adequately stated his claim for breach of contract against Catlin in connection with the 2009/10 Policy.[4]

### 2. Ogilvie

The amended complaint fails to state a claim against Ogilvie for breach of contract in connection with the 2009/10 Policy.  Plaintiff alleges that Ogilvie breached the 2009/10 Policy "by failing to provide a legal defense to [Plaintiff] in connection with the attorney's fees and costs incurred in the Klawans Arbitration."  (Am. Compl. ¶ 34.)  However, the Amended Complaint does not allege any factual basis—with the exception of conclusory allegations—for

---

[4] Plaintiff also alleges that he complied with the terms of the 2009/10 Policy by providing notice of the claim to Ogilvie, as an agent of Catlin.  Specifically, Plaintiff alleges that he "actually complied with the terms of the [2009/10 Policy] by timely notifying Ogilvie, cloaked with Catlin's apparent authority, of the Arbitration claim, for which he requested Catlin to provide a legal defense, within the applicable policy period."  (Am. Compl. ¶ 33.)  The question of apparent authority is fact-specific and not appropriate for resolution at this time.

7

the legal conclusion that Ogilvie had a contractual obligation to provide such a defense.[5] The Court also reviewed the 2009/10 Policy, which defines Ogilvie as a recipient—not a provider—of insurance coverage. Therefore, the Court will dismiss Count I against Ogilvie.

### B. Count II – Breach of Contract – 2010/11 Policy

The 2010/11 Policy clearly states that it "shall not apply to and [Ogilvie] shall pay neither damages nor Defense Expenses for . . . any claim, demand, suit, proceeding or investigation of which any Insured had notice, pending as of or prior to the inception of the Policy Period." (Am. Compl. Ex. A pp. 7-8.) Plaintiff acknowledges that he received the Klawans' arbitration claim on April 16, 2010, prior to the inception of the 2010 policy period. Therefore, Catlin's failure to defend Plaintiff against the Klawans' arbitration claim cannot be a breach of the 2010/11 Policy.

Plaintiff attempts to save this claim by arguing that the 2010/11 Policy's discovery period provision—which provides for a one-year discovery period beginning upon the termination or non-renewal of the insurance—is ambiguous. During the discover period, Plaintiff would be allowed to report claims retroactive to 2007. Plaintiff argues that it would be perverse not to allow an insured who renews his coverage with Catlin the same benefit of this discovery period as an insured who terminated the relationship. However, "there is a rationale for providing [an extended discovery period] only in the case of cancellation or nonrenewal." *Checkrite Ltd., Inc. v. Illinois Nat'l Ins. Co.*, 95 F. Supp. 2d 180, 193 (S.D.N.Y. 2000); *but see Cast Steel Prods., Inc. v. Admiral Ins. Co.*, 348 F.3d 1298, 1303-04 (11th Cir. 2003) (holding that it would be "both illogical and inequitable to deny coverage to the insured who chooses to renew its claims-made

---

[5] Ogilvie moved to dismiss this claim on different grounds. However, Ogilvie also adopted the arguments made by Catlin, including the argument that the breach of contract claim must fail because Defendants had no duty to provide the coverage sought by Plaintiff. (Ogilvie Br. at 3 n.1, ECF No. 28-1.) Normally, such a vague, general adoption of a superficially similar argument would not satisfy a defendant's burden to establish that a claim should be dismissed. However, Ogilvie has informed the Court that it no longer intends to offer a defense in this litigation. (ECF No. 47.) In light of this notice and Plaintiff's total failure to plead any contractual obligation on Ogilvie's part, the Court will address this argument.

policy for successive years with the same insurer"). An insured who terminates or does not renew its claims-made insurance "faces a risk of coverage gaps that can result from switching to an occurrence policy or to another claims-made policy." *Checkrite*, 95 F. Supp. 2d at 193 (citing *Ehrgood v. Coregis Ins. Co.*, 50 F. Supp. 2d 438, 446 (M.D. Pa. 1998)). Extended discovery periods allow the insured to mitigate that risk. *Id.* The exclusion of an insured who elects to renew their coverage with Catlin is apparent on the face of the Policy, and the fact that the exclusion leads to a somewhat unintuitive result does not render the provision ambiguous.

The amended complaint fails to state this claim against Ogilvie for the same reasons set forth in connection with Count I. The Court will dismiss Count II against Catlin and Ogilvie.

### C. Count III – Fraud

Under New York law, the elements of a *prima facie* case for fraud are: (1) a misrepresentation or material omission of fact which was false and known to be false by defendant; (2) made for the purpose of inducing the other party to rely upon it; (3) justifiable reliance of the other party on the misrepresentation or material omission; and (4) injury. *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1373 (N.Y. 1996).

Plaintiff alleges in Count III that Defendants misrepresented the terms of the insurance and caused him to believe that Catlin "would defend [Plaintiff] for claims filed against him by third parties, regardless of whether that third party purchased an insurance policy from or through Ogilvie." (Am. Compl. ¶ 50.) Defendant alleges that Defendants made these misrepresentations "with the intention to induce [Plaintiff] to not purchase supplemental E&O insurance coverage which may not be covered by Catlin." This allegation is simply not plausible. Plaintiff has offered no explanation for how either Defendant would profit by preventing Plaintiff from purchasing additional E&O coverage. Plaintiff acknowledges in the

9

amended complaint that he was required to buy coverage from Catlin, pursuant to the terms of his employment relationship with Ogilvie. (Am. Compl. ¶¶ 7-10.) Therefore, it is not clear how either of the Defendants would have benefitted from preventing Plaintiff from purchasing additional insurance coverage from Catlin or another company. Plaintiff has failed to plead facts sufficient to render Count III plausible on its face, so the Court will dismiss Count III against both Defendants.

### D. Count IV -- Fraud

Plaintiff alleges in Count IV that Defendants misrepresented the terms of the 2009/10 Policy and refused to produce to Plaintiff a copy of the contract, "with the intention to induce [Plaintiff] to hire private defense counsel to defend [Plaintiff] in the [Klawans' arbitration] claim." (Am. Compl. ¶¶ 56, 58.) The amended complaint does not identify any alleged misrepresentations with the particularity required by Rule 9(b) to support this claim. The amended complaint contains only one allegation that was arguably made to induce him to hire private defense counsel. Plaintiff alleges that on May 27, 2010, Plaintiff "was informed by Ogilvie that the Ogilvie/Catlin Policy would not cover the claim filed" in the Klawans arbitration. (*Id.* ¶ 21.) "Plaintiff has completely failed to identify any particular persons making false representations or provide any specifics as to the time or place at which the supposed misrepresentations were made." *Carlucci v. Owens-Corning Fiberglass Corp.*, 646 F. Supp. 1486, 1490 (E.D.N.Y. 1986). Therefore, this allegation is insufficient to support a claim for fraud.[6]

---

[6] Plaintiff also alleges that on October 26, 2010, Catlin sent Plaintiff a letter in which it "declined coverage on the ground that, *inter alia*, the sale of the Klawans' policies did not fall within the Policy's definition of 'clients' and the Klawans' Insurance Policies were not approved or authorized by Ogilvie." (Am. Compl. ¶ 26.) "[T]hose allegations merely evidence plaintiff's dissatisfaction with defendants' performance of the contract obligations." *N.Y. Univ. v. Continental Ins. Co.*, 662 N.E.2d 763, 769-70 (N.Y. 1995). "Plaintiff's claim amounts to nothing more than a claim based on the alleged breach of the implied covenant of good faith and fair dealing . . . and is duplicative of the [claim] for breach of contract . . . and should have been dismissed." *Id.*

However, the amended complaint does adequately allege that Defendants made material omissions. Plaintiff alleges that he was required by Ogilvie to purchase coverage under the Policies through Ogilvie's master policy with Catlin. (*See* Am. Compl. ¶¶ 2, 7.) He further alleges that, "[d]espite numerous requests, Ogilvie and Catlin intentionally refused to produce a copy of the applicable policy to [Plaintiff], including the reporting of the claims notice provisions." (*Id.* ¶ 21; *see also id.* ¶¶ 9, 24.) On October 15, 2010, after multiple requests, "Catlin finally produced a copy of the [2010/11] Policy subject to a full reservation of rights." (*Id.* ¶ 24.)

The allegation that Defendants repeatedly refused to disclose the terms of the contract between the parties, including the claims notice provisions, supports an inference that the Defendants intended to deceive Plaintiff as to the Policies' terms and deny him the benefit of the insurance. To the extent that Plaintiff failed to follow the claims notice procedures, that failure was caused by the alleged omission, and Plaintiff alleges that he incurred damages while defending against the Klawans' arbitration claim. (*Id.* ¶ 60.) These allegations support a claim for fraud.

Ogilvie argues that this claim should be dismissed because Plaintiff released Ogilvie from such liability. According to Ogilvie, a provision in the Sales Representative Agreement between Ogilvie and Plaintiff provides that Plaintiff "understands and agrees that [the basic E&O] coverage [provided by the Policies] may be insufficient for [Plaintiff's] needs . . . [and Ogilvie] shall not be responsible in the event that [the] basic coverage is determined to be insufficient for [Plaintiff's] business needs." (Ogilvie Br. at 6, ECF No. 28-1.) However, this claim does not depend on whether the Policies would have provided sufficient coverage if Plaintiff and Catlin fully complied with the terms of the agreement. The release provision has no bearing on the

allegation that Ogilvie intentionally deceived Plaintiff about the terms of the Policies. The provision in Ogilvie's Sales Representative Agreement does not release Ogilvie from potential fraud liability.

### E. Counts V and VI – Civil Conspiracy to Commit Fraud

Plaintiff acknowledges that New York does not recognize civil conspiracy as an independent tort. *Hickey v. Travelers Ins. Co.*, 558 N.Y.S.2d 554, 557 (N.Y. App. Div. 1990). However, Plaintiff argues that the Court should allow Plaintiff to rest this claim on Maryland law, despite the choice of law provision in the Policies. Although Maryland allows parties to apply choice of law provisions to contract-related tort claims, as explained above, there is an exception to this rule where application of the chosen law would be "contrary to a fundamental policy" of Maryland if it has a "materially greater interest than the chosen state in the determination of the particular issue." *Nat'l Glass, Inc. v. J.C. Penney Props., Inc.*, 650 A.2d 246, 248-49 (Md. 1994).

Even assuming that Maryland has a "materially greater interest" than New York in the determination of this issue, the recognition of civil conspiracy as an independent tort is not a fundamental policy of Maryland. As Plaintiff notes, the "gist" of the claim "is not the agreement but rather the overt conduct committed pursuant to it and the harm that flows from that conduct." *Alleco, Inc. v. Harry & Jeannette Weinberg Found., Inc.*, 639 A.2d 173, 177 (Md. App. 1994). It is "essentially a doctrine of joint tortfeasor liability." *Id.* Plaintiff's claims for the fraud at issue will continue, and he can seek damages for the alleged harm. In addition, this is not a case, as in *National Glass*, where the Maryland legislature "has unequivocally told the Maryland judiciary that a contractual provision . . . is void as against public policy." 650 A.2d 246 at 250. Instead, the tort of civil conspiracy arises from Maryland common law. *See Alleco*, 639 A.2d at 177

("The Court of Appeals first discussed and essentially defined the tort in [1871] . . ."). The Court will dismiss Counts V and VI.

### F. Count VII – Violation of NY Ins. Law § 2316 (Catlin Only)

The amended complaint alleges that Catlin, which is an insurance company licensed to provide professional insurance in New York and Maryland, and has an underwriting office in New York, agreed with Ogilvie "that Catlin would deny defense coverage to [Plaintiff] . . . despite the fact that the applicable policy provided for coverage" in connection with the Klawans' arbitration action. (Am. Compl. ¶¶ 76, 77.) Plaintiff alleges that this agreement violated N.Y. Ins. Law § 2316(a)(3), which provides that "[n]o insurer or rate service organization shall make any agreement with any other insurer, rate service organization or other person to restrain trade."

Plaintiff's claim under § 2316 fails because the amended complaint does not allege facts to support the inference that Catlin made an agreement "to restrain trade." Article 23 of the New York code—which contains § 2316 and applies to property and casualty insurance rates—does not define the phrase "restraint of trade." However, under both federal and New York law, that phrase is most commonly associated with legal proscriptions against monopolies and other anti-competitive business activities. *See, e.g.*, 15 U.S.C. § 1; N.Y. Gen. Bus. Law § 340. That is the context in which the prohibition against agreements to restrain trade in § 2316 must be interpreted.

Plaintiff has failed to plead facts to support the allegation that Catlin made an agreement to restrain trade. The amended complaint alleges that Catlin made an agreement not to provide Plaintiff with coverage that it owed him under the terms of their contract. However, such an agreement would not prospectively "restrain trade." Plaintiff and Catlin already executed a

contract, and the alleged agreement did not alter the terms of that contract. Plaintiff's allegation that Catlin entered an agreement to violate the terms of the contract is not sufficient to support the allegation that Catlin engaged in anti-competitive activity. The Court will dismiss Count VII.

### G. Count VIII – Tortious Interference with Contractual Relations (Catlin Only)

The amended complaint alleges that Catlin tortiously interfered with Plaintiff's contractual relationship with Ogilvie. In order to state a claim for tortious interference with contractual relations, the amended complaint must plead the following elements: (1) existence of a contract, enforceable by the plaintiff; (2) defendant's knowledge of the existence of the contract; (3) the intentional procurement by defendant of the breach of the contract; and (4) resultant damages to the plaintiff. *Joan Henson & Co., Inc. v. Everlast World's Boxing Headquarters Corp.*, 296 A.D.2d 103, 111 (N.Y. App. Div. 2002). Plaintiff has failed to plead any facts to support the third element of this claim.

Plaintiff has not pled facts to support the allegation that Ogilvie breached its contract with Plaintiff or that Catlin intentionally procured the breach of that contract. Plaintiff alleges that "[a]s a direct, proximate and substantial result of Catlin's improper and tortious conduct, [Plaintiff] has sustained and/or will continue to sustain, damages from the loss of his affiliation with Ogilvie as a Registered Representative and damages from reputational harm." (Am. Compl. ¶ 86.) Plaintiff argues that the Court should infer from this allegation "that Plaintiff's 'loss of affiliation' with Ogilvie was due to Ogilvie's breach" of the contract between Ogilvie and Plaintiff. At best, this allegation amounts to an unsupported legal conclusion. Plaintiff failed to plead facts sufficient to support the inferences that Ogilvie breached a contract by terminating its relationship with Plaintiff. Furthermore, the amended complaint does not allege how Catlin intentionally procured that breach. The Court will dismiss Count VIII.

### H. Count IX – Attorneys' Fees

The amended complaint adequately states a claim against Catlin for attorneys' fees, but does not state a claim against Ogilvie for attorneys' fees. Although attorneys' fees are rarely granted in actions for breach of contract, there is an exception to this rule under New York law "where there has been an unreasonable, bad faith denial of coverage." *New Eng. Mut. Life Ins. Co. v. Johnson*, 589 N.Y.S.2d 736, 738 (N.Y. Sup. Ct. 1992). The claim for attorneys' fees is an individual claim and not merely a measure of damages for breach of the contract. *See Lauder v. OneBeacon Ins. Group, LLC*, 918 N.Y.S.2d 825, 835 (N.Y. Sup. Ct. 2011) (plaintiff "failed to establish its entitlement to judgment as a matter of law on its attorneys' fees claim").

The claim for attorneys' fees requires not just "an arguable difference of opinion between carrier and insured," but "a showing of such bad faith in denying coverage that no reasonable carrier would, under the given facts, be expected to assert it." *Sukup v. State*, 227 N.E.2d 842, 844 (N.Y. 1967). The amended complaint alleges that Catlin prevented Plaintiff from learning the terms of their agreement, including the claims notice provisions, in an effort to deny him coverage to which he was entitled. Such a denial would constitute a sufficient showing of bad faith to justify the grant of a claim for attorneys' fees under New York law. *Compare New Eng. Mut. Life Ins. Co.*, 589 N.Y.S.2d at 739 (holding that an investigation "to find a bogus basis for disclaiming because the insured was a male homosexual" constituted sufficient bad faith).

The amended complaint does not allege that Ogilvie had any obligation to provide Plaintiff with insurance coverage, and Plaintiff has cited no authority that would justify an award of attorneys' fees against Ogilvie. Therefore, Count IX against Ogilvie for attorneys' fees will be dismissed.

## IV. CONCLUSION

Accordingly, an order shall issue GRANTING Plaintiff's motion for leave to amend the complaint (ECF No. 37), GRANTING IN PART and DENYING IN PART Catlin's motion to dismiss (ECF No. 27), and GRANTING IN PART AND DENYING IN PART Ogilvie's motion to dismiss (ECF No. 28).

Dated this 15th day of May, 2013

BY THE COURT:

_____/s/_____
James K. Bredar
United States District Judge